Nicole M. Perry, Esq., *Pro Hac Vice*
JONES DAY
717 Texas Street, Suite 3300
Houston, TX 77002
Telephone: (832) 239-3939
Facsimile: (832) 239-3600
Email: nmperry@jonesday.com

Bethany K. Biesenthal, Esq., *Pro Hac Vice*
Allison L. McQueen, Esq., *Pro Hac Vice*
JONES DAY
110 North Wacker Drive, Suite 4800
Chicago, IL 60606
Telephone: (312) 782-3939
Facsimile: (312) 782-8585
Email: bbiesenthal@jonesday.com
amcqueen@jonesday.com

Andrew J. Clopton, Esq., *Pro Hac Vice*
JONES DAY
150 W. Jefferson, Suite 2100
Detroit, MI 48226
Telephone: (313) 733-3939
Facsimile: (313) 230-7997
Email: aclopton@jonesday.com

Emily F. Knox (State Bar No. 307035)
JONES DAY
555 California Street, 26th Floor
San Francisco, CA 94104
Telephone: (415) 626-3939
Facsimile: (415) 875-5700
Email: egoldbergknox@jonesday.com

Attorneys for Defendant
*Hilton Domestic Operating Company Inc.*

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN JOSE DIVISION

JANE DOE (K.R.D.),

Plaintiff,

v.

HILTON DOMESTIC OPERATING COMPANY INC., et al.,

Defendants.

Case No. 5:24-cv-06993-PCP-VKD

**MOTION FOR SPOLIATION SANCTIONS**

Hearing Noticed For:
December 3, 2026
10:00 A.M.

Please take notice that on December 3, 2026, at 10:00 AM Pacific Time, Defendant Hilton Domestic Operating Company Inc. ("Hilton") will and hereby does respectfully move, pursuant to Federal Rule of Civil Procedure 37(e), for an order imposing sanctions against Plaintiff for failing to preserve electronically stored information. Specifically, Hilton seeks dismissal of this case because Plaintiff deleted a critical source of evidence—an Instagram account active during her alleged trafficking period—and otherwise failed to preserve any data from that account. In the alternative, Hilton seeks an adverse inference instruction that Plaintiff's destroyed evidence would have been unfavorable to her and supported an argument that she cannot meet her burden of proof in this case, attorneys' fees, and any other relief this Court deems just and proper.

## I. INTRODUCTION

This motion arises from a simple but serious problem: Plaintiff destroyed evidence that goes to the core of her case and then spent months concealing and misdescribing what she had done. The evidence at issue is Plaintiff's deleted Instagram account, which captured her day-to-day life in the years during and after the period in which she claims she was trafficked. Plaintiff never disclosed that account, deleted it right before suing Hilton, and preserved none of its contents.

In her sworn interrogatory responses, Plaintiff identified only one Facebook account and one Instagram account ([redacted]) and swore that she had used both since 2013. Pl.'s Resp. to Hilton's Interrog. No. 7, Exhibit A, at 6. She later led the Court to believe the same, representing that she had "responded with respect to the Instagram information as ordered by the Court." Joint Status Report 2, Dkt. No. 84.

This was false. Hilton's own investigation later revealed that the disclosed Instagram account was created in October 2024, the same month Plaintiff filed this lawsuit. Anderson Decl., Exhibit B, ¶ 11; Compl., Dkt. No. 1. Only when confronted with that fact did Plaintiff admit that she had a second, deleted Instagram account. *See id.*; emails from B. Blevins, Provost Umphrey, to A. Anderson, Jones Day (May 1, 2026; May 3, 2026) [hereinafter May 1 Email], Exhibit C, at 1. By then, the account was gone. Plaintiff had deleted it years after retaining counsel to bring her claims and shortly before filing her first lawsuit against Hilton, without archiving, exporting, or otherwise preserving its contents. *See* May 1 Email, Exhibit C, at 1. Meta, which Hilton

subpoenaed, has been unable to retrieve the account. *See* email from C. del Fierro, Ashurst Perkins Coie, counsel for Meta, to C. Baldwin, Jones Day (Sept. 24, 2026), Exhibit D, at 1. The content is irretrievably lost.

Plaintiff's representations since then have only deepened the problem. She has given shifting accounts of when the account was created, how she used it, and when she deleted it. She has missed Court-ordered production deadlines and disclosed additional accounts only after Hilton found them on its own. *See* Anderson Decl., Exhibit B, ¶¶ 11–14; Further Order re Feb. 11, 2026 Disc. Dispute 3, Dkt. No. 85. The circumstances—the timing of deletion, her choice to delete rather than deactivate or archive the account, the selective preservation of other social media, and her repeated misrepresentations—show that Plaintiff intended to deprive Hilton of this evidence. The lost content goes to questions at the heart of this case, including whether and when Plaintiff was trafficked at a Hilton hotel—and whether Defendants knew or should have known about it. This action should therefore be dismissed.

## II. BACKGROUND[1]

### A. The origin of this lawsuit.

Plaintiff alleges she was sex trafficked at the DoubleTree by Hilton San Jose ("San Jose DoubleTree") from March 1, 2014 to December 31, 2016 by her romantic partner. *Doe (K.R.D.) v. Hilton Worldwide Holdings Inc.*, 798 F. Supp. 3d 1082, 1087 (N.D. Cal. 2025).[2] The San Jose DoubleTree is a hotel that was owned by HLT San Jose, LLC and managed by Hilton during the trafficking period. *See* Anderson Decl., Exhibit B, ¶ 3.

Plaintiff asserts a civil claim against Hilton under both perpetrator and beneficiary theories of liability under the TVPRA. *Doe (K.R.D.)*, 798 F. Supp. 3d at 1090. Under the beneficiary theory, Plaintiff must prove that Hilton (1) "knowingly benefit[ted], financially or by receiving anything of value"; (2) "from participation in a venture"; (3) that they "knew or should have known has engaged in an act in violation of this chapter." *Id.* at 1092 (quoting 18 U.S.C. § 1595(a)). Under the perpetrator theory, Plaintiff must prove that Hilton (1) "knowingly harbored or

---

[1] Attached as Exhibit E is a chronology of the background of this motion in table form.

[2] At her deposition, Plaintiff claimed that she was trafficked at the San Jose DoubleTree in particular from approximately July 2014 to July 2015. Pl. Dep. 144:15–23, 193:4–11, Exhibit F.

maintained her"; (2) "with knowledge that fraud or force would be used to cause her to engage in a commercial sex act." *Id.* at 1099. A central issue under both theories is whether Plaintiff was being forced or coerced into engaging in commercial sex acts at the San Jose DoubleTree—and whether Hilton had knowledge about it. *See id.* at 1097, 1099. Plaintiff will also need to prove she suffered damages as a result of Hilton's conduct, including for—as claimed—mental anguish and emotional distress, anxiety, depression, and PTSD, as a result of the trafficking that occurred at the San Jose DoubleTree. *See* Order re Feb. 11, 2026 Disc. Dispute [hereinafter Apr. 16 Order] 6, Dkt. No. 83; 18 U.S.C. § 1595(a); *Doe 1 v. Apple Inc.*, 96 F.4th 403, 411 (D.C. Cir. 2024) ("the TVPRA requires [] a wrongful act that causes an injury").

Plaintiff claims her trafficking ended, at the latest, on December 31, 2016. *Doe (K.R.D.)*, 798 F. Supp. 3d at 1087. She retained an attorney for this matter on January 17, 2019. Pl.'s Supp. Resp. to Hilton's Req. Produc. No. 7, Exhibit G, at 4. Plaintiff filed her first lawsuit on June 10, 2024 against other Hilton-affiliated defendants who were improperly named. *Doe v. Hilton Resorts Corp.* (*K.R.D. I*), No. 5:24-cv-03499 (N.D. Cal. June 10, 2024). After voluntarily dismissing that action, Plaintiff filed the instant lawsuit on October 4, 2024. Compl., Dkt. No. 1.

**B. Hilton's initial discovery requests and Plaintiff's response.**

As relevant to the current dispute, on September 9, 2025, Hilton requested a complete download of Plaintiff's social media from the beginning of the alleged trafficking period to the present (attaching instructions for how to do so) and identification of any accounts she used while she was allegedly trafficked. Hilton's Req. Produc. No. 46 [hereinafter RFP 46], Exhibit H, at 11; Courtesy Social Media Download Guidance, Exhibit I; Hilton's Interrog. No. 7, Exhibit J, at 5.

As Hilton explained, this information is relevant to showing, among other things, Plaintiff's whereabouts during the dates on which she alleges she was trafficked at the San Jose DoubleTree; communications involving or exchanged with her trafficker, his associates, or her alleged johns; Plaintiff's involvement in dating or romantic relationships during the time in which she was allegedly trafficked; Plaintiff's discussions regarding her trafficking and encounters with law enforcement; and Plaintiff's ability to travel outside of San Jose, California. Apr. 16 Order 1–2, Dkt. No. 83. This information bears directly on whether and when Plaintiff was trafficked at the

hotel and whether hotel staff had knowledge about it, as well as the exact nature of her relationship with her alleged trafficker and the events at issue. Moreover, as Hilton explained, because Plaintiff has not sought medical treatment or counseling for these alleged injuries, her social-media posts are the only "objective and contemporaneous examples" of her day-to-day activities, emotional condition, and functional capacity, and thus are directly related to the damages that she attributes to Hilton. Joint Letter re Disc. Dispute 4, Dkt. No. 71 (collecting cases).[3]

On October 21, 2025, Plaintiff identified two social media accounts: an Instagram account ([redacted]) and a Facebook account, both of which she claimed to have maintained from 2013 (before her trafficking) through the present. Pl.'s Resp. to Hilton's Interrog. No. 7, Exhibit A, at 6. The parties conferred about discovery deficiencies related to these social media accounts at meet-and-confers on January 6 and February 3, 2026. Anderson Decl., Exhibit B, ¶ 4.

### C. The Court's prior orders on Plaintiff's social media productions.

By February 11, 2026, Plaintiff refused to produce any social media content, so the parties filed a joint letter with the Court. Joint Letter re Disc. Dispute, Dkt. No. 71. Hilton explained that Plaintiff "identified one Facebook account and one Instagram account as those she used during the trafficking period, and she has not identified any additional accounts." *Id.* at 2. Plaintiff made no further correction to that statement; instead, Plaintiff argued only that Hilton's request for "wholesale social-media downloads for a twelve-year period" was "overly broad, irrelevant, and not proportional to the needs of the case." *Id.* at 5.

On March 31, 2026, Judge DeMarchi held an in-person hearing. *See* Interim Order re Feb. 11, 2026 Disc. Dispute 1, Dkt. No. 81. At the hearing, Plaintiff admitted that she had not collected her Instagram account in response to Hilton's request. Anderson Decl., Exhibit B, ¶ 7. Notably, Judge DeMarchi agreed with Hilton that Plaintiff's social media content is relevant to both the alleged trafficking period and her claimed damages, and directed the parties to revise RFP 46 to "identify topics, by time period, for which Hilton wishes to obtain social media content." *Id.*;

[3] Plaintiff has produced no medical records or other corroborating evidence of her damages. *See* Section II.H, *infra*.

Interim Order re Feb. 11, 2026 Disc. Dispute, Dkt. No. 81. The Court then directed the parties to confer on the "methods for identifying responsive information." *Id.*

On April 2, 2026, Hilton provided Plaintiff with a revised RFP 46 requesting social media content for specific topics in the alleged trafficking period and the alleged damages period.[4] Email from A. Anderson, Jones Day, to B. Blevins & C. Brown, Provost Umphrey, Exhibit K, at 2–3; Exhibit A to Joint Status Report, Dkt. No. 82-1. On April 8, 2026, Plaintiff responded. Email from B. Blevins, Provost Umphrey, to A. Anderson, Jones Day, Exhibit K, at 1–2. Although Plaintiff offered to produce "everything" from her alleged trafficking period, she only offered to produce damages-related social media content for two years: the year after the alleged trafficking and the year before suit. *Id*. That offer disregarded Judge DeMarchi's ruling at the March 31 hearing that Plaintiff's entire claimed damages period, which runs from the end of the alleged trafficking period to the present, was relevant. Email from A. Anderson, Jones Day, to B. Blevins, Provost Umphrey (Apr. 8, 2026), Exhibit K, at 1. Accordingly, Hilton objected to Plaintiff's proposal. *Id.*

On April 9, 2026, Plaintiff made her first social media production containing content from her Facebook account from July 2014 to July 2016 (i.e., her approximate claimed trafficking period). Anderson Decl., Exhibit B, ¶ 5. She did not produce anything from her Instagram account, [redacted]. *Id.*

On April 10, 2026, the parties met and conferred. *See* email from A. Anderson, Jones Day, to B. Blevins, Provost Umphrey, Exhibit L, at 2–3. Plaintiff represented for the first time that her [redacted] Instagram account was *not* active during the alleged trafficking period, in direct contradiction to her sworn response to Interrogatory No. 7. *See id.*; Pl.'s Resp. to Hilton's Interrog. No. 7, Exhibit A, at 6. Plaintiff then represented that she had not downloaded content from her Instagram account and would not agree to do so. *See* email from A. Anderson, Jones Day, to B. Blevins, Provost Umphrey, Exhibit L, at 2–3. On April 11, 2026, Plaintiff reiterated over email that she had not downloaded her Instagram content. Email from B. Blevins, Provost Umphrey, to A. Anderson, Jones Day, Exhibit L, at 1–2.

---

[4] Hilton defines "content" as "including narrative posts, photographs and tags, captions, geotags, check-ins, stories, direct messages, and any other communications or published posts." Exhibit A to Joint Status Report, Dkt. No. 82-1.

On April 13, 2026, Plaintiff made her second production of social media content comprised of content from her Facebook account—the vast majority of which was dated August 2016 to June 2017, with just eleven social media files from 2018 to 2025. Anderson Decl., Exhibit B, ¶ 5.

On April 14, 2026, the parties filed a Joint Status Report on Plaintiff's social media. Dkt. No. 82. Plaintiff represented to the Court that she "does not have a download of her Instagram account" and that "[i]t was not active during her trafficking period and is not active today." *Id.* at 4. Plaintiff's representation to the Court is inconsistent with her response to Interrogatory No. 7 indicating her account was active from 2013 to the present (i.e., during her trafficking period), Pl.'s Resp. to Hilton's Interrog. No. 7, Exhibit A, at 6, and with her statement just four days earlier that the account was currently "active." Email from A. Anderson, Jones Day, to B. Blevins, Provost Umphrey (Apr. 10, 2026), Exhibit L, at 3. She continued to refer to a singular "Instagram account." Joint Status Report 4, Dkt. No. 82.

On April 16, 2026, Judge DeMarchi ordered the parties to "confer to identify the subject matter categories for which [Plaintiff's] social media may contain relevant information, given the nature of [the] claimed harm and the time period or periods during which she experienced that harm." Apr. 16 Order 7, Dkt. No. 83. Judge DeMarchi also acknowledged her understanding—based on Plaintiff's representations—that Plaintiff "has (or had) two social media accounts of interest to Hilton: a Facebook account and an Instagram account." *Id.* at 3. Accordingly, she ordered, among other things, Plaintiff to advise Hilton by April 24 if she "no longer has *any* content from her Instagram account, apart from content that may have also been posted to her Facebook account." *Id.* at 6. At the time, Hilton understood this order to relate to Plaintiff's [redacted] Instagram account—the only Instagram account Plaintiff had disclosed at the time. Plaintiff did not respond by the Court's deadline. Anderson Decl., Exhibit B, ¶¶ 8–9.

**D. Hilton's identification of an undisclosed Instagram account that was deleted one month before Plaintiff filed her first lawsuit.**

On April 27, 2026, Hilton emailed Plaintiff's counsel regarding violations of the Court's April 16 order. Email from A. Anderson, Jones Day, to B. Blevins & C. Brown, Provost Umphrey, Exhibit C, at 3. On April 28, 2026, Hilton followed up with a deficiency letter. Letter from N.

Perry, Jones Day, to B. Blevins & C. Brown, Provost Umphrey, and A. Walbrun, Boucher LLP, Exhibit M [hereinafter Apr. 28 Letter]. Hilton had discovered, based on its own research, that Plaintiff's current Instagram account ([redacted]) was created in October 2024—the same month this lawsuit was filed. Anderson Decl., Exhibit B, ¶ 11. That creation date cannot be squared with Plaintiff's sworn interrogatory response that she had maintained the account since 2013. *See* Pl.'s Resp. to Hilton's Interrog. No. 7, Exhibit A, at 6. Nor can it be reconciled with Plaintiff's own 2016 Facebook content, which displays cross-posts from another visible Instagram account that was active years before [redacted] existed. *See* Apr. 28 Letter, Exhibit M, at 8–9. Hilton confronted Plaintiff's counsel with this issue in a meet-and-confer on April 29, 2026. Anderson Decl., Exhibit B, ¶ 13.

In follow-up conversations on May 1 and May 7, 2026, Plaintiff's counsel admitted—for the first time—that Plaintiff had a previous Instagram account she had never disclosed. *See* May 1 Email, Exhibit C, at 1; Anderson Decl., Exhibit B, ¶ 14. Counsel confirmed that Plaintiff deleted her previous Instagram account in "approximately" April 2024—one month before Plaintiff filed her first unsuccessful TVPRA lawsuit against Hilton's affiliates. *See* May 1 Email, Exhibit C, at 1; *K.R.D. I*, No. 5:24-cv-03499. Plaintiff's counsel also represented that Plaintiff no longer had access to any content from her original Instagram account except for content that was maintained through cross-posts to Facebook. May 1 Email, Exhibit C, at 1.

On May 8, 2026, the parties filed another Joint Status Report. Dkt. No. 84. Hilton raised that, since the Court's April 16 order, it was revealed that Plaintiff had another Instagram account, which she had not disclosed and which she deleted. *Id.* at 1. Plaintiff, for her part, represented to the Court that she had "responded with respect to the Instagram information as ordered by the Court." *Id.* at 2. Plaintiff, however, was not forthcoming with any other information. Instead, she forced Hilton to continue to spend resources extracting information about her original Instagram account.

**E. Plaintiff's continued evasion of her discovery obligations and conflicting representations about her original Instagram account.**

On May 13, 2026, the Court ordered that Plaintiff produce by May 28, 2026 *all* of her available social media content—including from Facebook and Instagram—"without limitation" from summer 2014 through summer 2016 and October 4, 2023 to October 4, 2025, as well as a 50% sampling selected by Hilton from the remainder of her damages period. Further Order re Feb. 11, 2026 Disc. Dispute 3, Dkt. No. 85. Hilton provided the sampling protocol on May 18, 2026, in a letter that also followed up on outstanding deficiencies. Letter from N. Perry, Jones Day, to B. Blevins & C. Brown, Provost Umphrey, and A. Walbrun, Boucher LLP, Exhibit N. On May 27, 2026, Plaintiff produced her third social media production, containing only Facebook content from May 2014 to December 2016, in direct violation of the Court's order and Hilton's proposed sample. Anderson Decl., Exhibit B, ¶ 5; Further Order re Feb. 11, 2026 Disc. Dispute 3, Dkt. No. 85.

On May 28, 2026, Plaintiff served her fifth amended interrogatory responses. Pl.'s Fifth Am. Supp. Objs. Resps. to Hilton's First Set Interrogs., Exhibit O. In her response to Interrogatory No. 7, Plaintiff claimed that her original Instagram account, [redacted], was created in 2016 and was "just used to watch reels." *Id.* at 10. That explanation does not hold up. Instagram did not introduce Reels until 2020[5], and Plaintiff's own Facebook cross-posts show that she was sharing Instagram content in 2016 and 2017. *See* Anderson Decl., Exhibit B, ¶ 10; Apr. 28 Letter, Exhibit M, at 8–9. Plaintiff also claimed that she could not remember when she deleted the account, even though her counsel had already told Hilton that she deleted it in approximately April 2024. *See* Pl.'s Fifth Am. Supp. Resp. to Hilton's Interrog. No. 7, Exhibit O, at 10. In the same response, Plaintiff admitted her current Instagram account, [redacted], was created in October 2024 and identified a Snapchat account that was active in 2013. *Id.* Plaintiff did not verify her responses until two and a half months later and only after Hilton reminded her. Anderson Decl., Exhibit B, ¶ 17; Email from M. Andrews, Provost Umphrey (Aug. 11, 2026), Exhibit P.

---

[5] Todd Spangler, *Instagram Reels, a Copycat of TikTok, Lands in 50-Plus Countries*, Variety (Aug. 5, 2020, 6:00 AM), https://variety.com/2020/digital/news/instagram-reels-launches-tiktok-copycat-1234725509/.

On June 15, 2026, Hilton sent a third letter regarding ongoing deficiencies in Plaintiff's production. Letter from N. Perry, Jones Day, to B. Blevins & C. Brown, Provost Umphrey, and A. Walbrun, Boucher LLP, Exhibit Q.

On June 18, 2026, Plaintiff made her fourth social media production, again containing only Facebook content. *See* Anderson Decl., Exhibit B, ¶ 5. Included in this production were May 2019 Facebook messages in which Plaintiff shared with a boudoir photograph an Instagram handle [redacted]—another undisclosed username. JD(KRD)-18471–72, Exhibit R. The production also included, among other things, photographs and geolocation tags that partially document Plaintiff's whereabouts during and after the alleged trafficking period, *see* JD(KRD)-06125; limited photographs of Plaintiff with her trafficker during her alleged trafficking period, *see* JD(KRD)-02166; Facebook messages, sent after the trafficking period, in which Plaintiff appears to offer sex to men in exchange for money, *see* JD(KRD)-30431; and messages about boudoir photoshoots for Plaintiff's Instagram account[6], *see* JD(KRD)-18471–72. Exhibit R.

On June 23, 2026, Hilton emailed Plaintiff's counsel and raised spoliation concerns. Email from N. Perry, Jones Day, to B. Blevins, Provost Umphrey, and A. McAdams, Annie McAdams PC, Exhibit S, at 17–18.

On June 25, 2026, one month after the Court-ordered deadline, Plaintiff made her fifth social media production. *See* Anderson Decl., Exhibit B, ¶ 5. This production contained Instagram content from her current Instagram account ([redacted]) dating from October 2024 to May 2026. *Id.*

**F. Hilton's subpoenas to Meta for content from Plaintiff's original Instagram account, which Meta was unable to locate.**

On July 10, 2026, Hilton subpoenaed Meta for content from Plaintiff's original Instagram account, [redacted], and provided Plaintiff's full name and the time period during which Plaintiff represented the account was active (2016 to 2024). Subpoena of Meta Platforms, Inc., Exhibit T. Meta responded that it could not identify the account based on the information provided and noted the requested data may no longer be available. Letter from C. del Fierro, Ashurst Perkins

[6] This exhibit has been cropped in order to remove explicit photos.

Coie, counsel for Meta, to E. Goldberg Knox, Jones Day (July 23, 2026), Exhibit U, at 1–2 (noting "the information you provided does not uniquely identify an Instagram user account" and "Meta may not have records going back to 2016").

On August 7, 2026, Hilton and Meta conferred, with Plaintiff's counsel present, about additional information that could help Meta locate the account, such as a date on which Plaintiff was certain the account was active. *See* Anderson Decl., Exhibit B, ¶¶ 18–19. On August 19, 2026, Plaintiff's counsel stated: "2017 to 2022 is [Plaintiff's] best guess but I wouldn't say she's certain about it," which again was inconsistent with her previous representations. Email from C. Brown, Provost Umphrey, to C. Baldwin, Jones Day, Exhibit S, at 1–2. Plaintiff also represented, and Hilton relayed to Meta, that the email [redacted] may have been associated with the account, that the account previously had the [redacted] username at least as of May 2019, and that Plaintiff believed the account was active at least between December 31, 2017 and January 1, 2022. *See id.*; email from C. Baldwin, Jones Day, to C. del Fierro, Ashurst Perkins Coie, counsel for Meta (Sept. 9, 2026), Exhibit D, at 2; *see also* Anderson Decl., Exhibit B, ¶ 19. Meta subsequently informed the parties on September 24, 2026, that it remained unable to locate the account. Email from C. del Fierro, Ashurst Perkins Coie, counsel for Meta, to C. Baldwin, Jones Day, Exhibit D, at 1. Having exhausted its options, Hilton began preparing the instant motion shortly thereafter.

### G. Plaintiff's continued contradictory representations about her original Instagram account at her deposition.

Hilton deposed Plaintiff on August 25, 2026. Pl. Dep., Exhibit F. She testified that she created her original Instagram account in 2016—not 2013 as stated in her initial interrogatory responses—and that she did not have any Instagram accounts before 2016. *Id.* at 268:17–269:4, 270:10–12. She testified she created the account under the handle [redacted] and changed the handle to [redacted] when she married [redacted] in July 2017. *See id.* at 28:4–5, 272:19–274:1. Plaintiff explained that she used the original Instagram account to post about her "day-to-day life" after the trafficking period, including birthday parties and friend outings—not

solely "to view posts or videos" and "to watch reels," as she previously claimed. *See id.* at 323:24–324:11; Pl.'s Sixth Supp. Resp. to Hilton's Interrog. No. 7, Exhibit V, at 10.

Plaintiff also tried to backtrack on the date she deleted her Instagram account. At her deposition, Plaintiff testified she deleted the [redacted] account in "either March or April of 2023"—not April 2024 as her counsel previously repeatedly represented. *See* Pl. Dep. 269:25–270:2, Exhibit F; Anderson Decl., Exhibit B, ¶ 14. Plaintiff further claimed that she deleted her Instagram account because her new husband told her to do so based on its content. Pl. Dep. 255:13–20, 271:19–23, Exhibit F. When asked whether she was aware she should not delete social media content in anticipation of a lawsuit and whether the Instagram account would constitute evidence in this case, Plaintiff declined to answer on counsel's instruction. *Id.* at 242:22–243:11, 266:14–19. The counsel at deposition was not the counsel (or firm) that Plaintiff had engaged in 2019. Pl. Dep. 7:20–23, Exhibit F; Pl.'s Supp. Resp. to Hilton's Req. Produc. No. 7, Exhibit G, at 4.

### H. Plaintiff's other discovery violations.

As the above makes clear, Plaintiff has consistently flouted her discovery obligations and ignored this Court's orders, forcing Hilton to identify each deficiency and push Plaintiff to correct it.

She admitted, six months after Hilton's original request, that she had not collected her Instagram account despite acknowledging the relevance of other social media. *Supra* at 4. Despite Hilton explaining multiple times her discovery obligations to produce social media from 2014 to 2025, she largely refused to comply and produced Facebook content that covered a year of her claimed damages period and only eleven files from 2018 to 2025. *Supra* at 5–6. When ordered to produce all available Facebook and Instagram content "without limitation" from summer 2014 through summer 2016 and October 4, 2023 to October 4, 2025, Plaintiff only produced Facebook content from May 2014 to December 2016. *Supra* at 8–9. Her first Instagram production came nearly one month after the Court's deadline. *Supra* at 9.

But that is not all. Plaintiff disclosed for the first time at her August 25, 2026 deposition that she maintained two additional email accounts during the relevant trafficking and damages periods, and that neither account had been collected or searched for responsive material. Pl. Dep.

24:1–25:9, 34:14–36:13, Exhibit F.

Plaintiff also never initially disclosed that she had a Snapchat account during her trafficking period. Hilton discovered it on its own after spotting Snapchat-specific filters in photos from Plaintiff's Facebook account, and raised the account with Plaintiff on April 28, 2026. Apr. 28 Letter, Exhibit M. Plaintiff did not identify the account until her fifth amended interrogatory responses, served May 28, 2026, a full month later. Pl.'s Fifth Am. Supp. Resp. to Hilton's Interrog. No. 7, Exhibit O, at 10.

And despite Hilton's request for medical records and other evidence of Plaintiff's claimed damages, Hilton's Req. Produc. Nos. 36–38, Exhibit H, at 10, Plaintiff has not produced a single document, instead relying on her own testimony. Pl.'s Sixth Supp. Resp. to Hilton's Interrog. Nos. 14 & 15, Exhibit V, at 15–17. For example, at her deposition, Plaintiff testified that she had hospital stays for the birth of her child fathered by her trafficker during the trafficking period and for memory loss and headaches associated with a car crash. She also testified that she could have requested those records but never did. Pl. Dep. 72:21–73:20, 74:14–19, Exhibit F; *see also* Anderson Decl., Exhibit B, ¶ 25. Hilton has since had to serve subpoenas for those records itself.

* * *

All told, Plaintiff's discovery abuses—namely, failing to disclose relevant accounts, deleting the source of key evidence, and repeatedly misrepresenting the facts surrounding that deletion to Hilton and the Court—have deprived Hilton of evidence that cannot be recovered.

## III. Legal Standard

Spoliation "refers to the destruction or material alteration of evidence or to the failure to preserve property for another's use as evidence in pending or reasonably foreseeable litigation." *Apple Inc. v. Samsung Elecs. Co., Ltd.*, 888 F. Supp. 2d 976, 989 (N.D. Cal. 2012). "There are two sources of authority under which a district court can sanction a party who has despoiled evidence: the inherent power of federal courts to levy sanctions in response to abusive litigation practices, and the availability of sanctions under Rule 37." *Leon v. IDX Sys. Corp.*, 464 F.3d 951, 958 (9th Cir. 2006). Rule 37(e) governs where a party fails to preserve electronically stored information. *Gregory v. State of Montana*, 118 F.4th 1069, 1072 (9th Cir. 2024).

"Rule 37(e) authorizes a court to sanction a party for losing or destroying ESI it had a duty to preserve." *Fast v. GoDaddy.com LLC*, 340 F.R.D. 326, 334 (D. Ariz. 2022). Thus, if ESI that "should have been preserved in the anticipation or conduct of litigation is lost because a party failed to take reasonable steps to preserve it, and it cannot be restored or replaced through additional discovery," a court may impose two levels of sanctions. FED. R. CIV. P. 37(e).

*First*, Section (e)(1) permits a court, "upon finding prejudice to another party from loss of the information," to "order measures no greater than necessary to cure the prejudice." FED. R. CIV. P. 37(e)(1).

*Second*, Section (e)(2) permits a court to impose more severe sanctions if it finds the spoliating party acted with the "intent to deprive another party of the information's use in the litigation." If the court finds a party acted with the requisite intent to spoil evidence, it may "(A) presume that the lost information was unfavorable to the party; (B) instruct the jury that it may or must presume the information was unfavorable to the party; or (C) dismiss the action or enter a default judgment." FED. R. CIV. P. 37(e)(2).

## IV. Argument

### A. Plaintiff failed in her duty to preserve social media evidence which cannot be restored or replaced.

At the threshold, all three criteria necessary for spoliation sanctions are met: "(1) the ESI 'should have been preserved in the anticipation or conduct of litigation'; (2) the ESI 'is lost because a party failed to take reasonable steps to preserve it'; and (3) '[the ESI] cannot be restored or replaced through additional discovery.'" *Porter v. City & Cnty. of San Francisco*, 2018 WL 4215602, at *3 (N.D. Cal. Sept. 5, 2018) (quoting FED. R. CIV. P. 37(e)).

#### 1. Plaintiff's duty to preserve her social media arose before she filed this lawsuit.

*First*, Plaintiff had a duty to preserve the social media she used during and after her alleged trafficking. "As soon as a potential claim is identified, a litigant is under a duty to preserve evidence which it knows or reasonably should know is relevant to the action." *In re Napster, Inc. Copyright Litig.*, 462 F. Supp. 2d 1060, 1067 (N.D. Cal. 2006). "The duty to preserve arises not only during litigation, but also extends to the period before litigation when a party should reasonably know that

evidence may be relevant to anticipated litigation." *Oracle Am., Inc. v. Hewlett Packard Enter. Co.*, 328 F.R.D. 543, 549 (N.D. Cal. 2018) (citation modified). "Federal courts across the country have recognized that a plaintiff's duty to preserve is more often triggered before litigation commences, in large part because plaintiffs control the timing of the litigation." *Cohn v. Guaranteed Rate, Inc.*, 318 F.R.D. 350, 354 (N.D. Ill. 2016) (citation modified). Indeed, a "duty to preserve ESI can arise far in advance of the formal retention of a lawyer or the filing of a lawsuit." *RG Abrams Ins. v. L. Offs. of C.R. Abrams*, 342 F.R.D. 461, 504 (C.D. Cal. 2022).

To determine when a duty to preserve arises, "courts consider a variety of factors, including the type and seriousness of the injury; how often similar kinds of incidents lead to litigation; the course of conduct between the parties . . . ; and what steps both parties took after the incident and before the loss of the evidence." *Bistrian v. Levi*, 448 F. Supp. 3d 454, 468 (E.D. Pa. 2020); *see also Cress v. Nexo Cap. Inc.*, 2026 WL 2395238, at *12 (N.D. Cal. Aug. 17, 2026) (noting whether "litigation is reasonably foreseeable is a flexible fact-specific standard" (citation modified)). "Courts apply this standard to lay and sophisticated plaintiffs alike." *Vander Pas v. Bd. of Regents of Univ. of Wis. Sys.*, 664 F. Supp. 3d 893, 905 (E.D. Wis. 2023).

Here, Plaintiff alleges she was trafficked from 2014 to 2016. *Doe (K.R.D.)*, 798 F. Supp. 3d at 1087. It was thus reasonably foreseeable as of at least the end of 2016 that she would have a claim under the TVPRA, which was expanded in 2008 to allow lawsuits against third parties who "knowingly benefit" from participation in a trafficking venture, § 1595(a). *See Waymo LLC v. Uber Techs., Inc.*, 2018 WL 646701, at *14 (N.D. Cal. Jan. 30, 2018) (explaining that standard is "objective" and "ask[s] not whether the party in fact reasonably foresaw litigation, but whether a reasonable party in the same factual circumstances would have reasonably foreseen litigation" (citation modified)).

Plaintiff also knew that her social media was relevant to her trafficking and damages claims, and preserved other forms of social media, including her Facebook account and its content from the time period during which she alleges that she was trafficked.[7] *See* Anderson Decl., Exhibit B,

---

[7] While Plaintiff now maintains that she created her now-deleted Instagram account only after the alleged trafficking in 2016, her own word is the sole support for that claim, and her deletion of the account has made it impossible to verify.

¶¶ 5–6. Indeed, she agreed to produce "everything" from her Facebook account for the alleged trafficking period and has since produced Facebook content dating back to 2014. Email from B. Blevins, Provost Umphrey, to A. Anderson, Jones Day (Apr. 8, 2026), Exhibit K, at 1–2. She cannot now claim that the content of her Instagram account, which she used to post about her "day-to-day life," was somehow irrelevant. Pl. Dep. 323:24–324:11, Exhibit F.

On the contrary, social media information is "not only relevant, it is critical" in TVPRA cases. *M.A. v. Wyndham Hotels & Resorts, Inc.*, 2024 WL 3029215, at *3 (S.D. Ohio June 17, 2024); *see also* Order at 4, *In re Hotel TVPRA Litigation*, No. 2:19-cv-755 (S.D. Ohio Apr. 30, 2026) (Jolson, J.) ("Up front, social media information is relevant to the claims and defenses in [TVPRA] action[s]"); *S.C. v. Wyndham Hotels & Resorts, Inc.*, 2024 WL 21548, at *2, *4 (N.D. Ohio Jan. 2, 2024) ("Plaintiff's social media activity from . . . the alleged trafficking period[] is closely related to core issues in this case."); *Doe v. Salesforce.com, Inc.*, 2026 WL 183827, at *5 (W.D. Wash. Jan. 23, 2026) ("[I]nquir[ies] about plaintiff's control over [her] social media account[s] both before and after the trafficking period" are relevant.). After all, "where else would be the most relevant information regarding what [Plaintiff] was going through and what other people should have known about her than in her private [social media] messages?" *M.A.*, 2024 WL 3029215, at *3; Order at 4, *In re Hotel TVPRA Litigation*, No. 2:19-cv-755 (similar). Plaintiff, therefore, should have preserved her social media content at the end of her claimed trafficking period.

In any event, Plaintiff's duty to preserve her social media activity arose at the very latest on January 17, 2019, when she retained counsel for this matter. *See, e.g.*, *Cohn*, 318 F.R.D. at 354 (finding party had obligation to preserve evidence as soon as she "ma[de] explicit references to legal action . . . and she had retained the attorney who represents her in this lawsuit"); *Innis Arden Golf Club v. Pitney Bowes, Inc.*, 257 F.R.D. 334, 340 (D. Conn. 2009) (holding duty to preserve evidence arose no later than when "counsel was actively involved in the investigation and analysis of the samples in preparation for legal action").

**2. Plaintiff breached her duty by deleting her original Instagram account.**

*Second*, despite her duty to preserve all social media activity from the alleged trafficking period and beyond, Plaintiff failed to take reasonable steps to do so. "A party breaches its duty to preserve relevant evidence if it fails to act reasonably by taking positive action to preserve material evidence." *United States ex rel. Staggers v. Medtronic, Inc.*, 830 F. Supp. 3d 49, 66 (D.D.C. 2026) (citation modified) (quoting *Victor Stanley, Inc. v. Creative Pipe, Inc.*, 269 F.R.D. 497, 525 (D. Md. 2010)).

Here, Plaintiff not only failed to preserve data, she intentionally deleted it. Plaintiff admitted that she deleted her original Instagram account in April 2024—one month before she filed her first TVPRA lawsuit against Hilton.[8] *See* May 1 Email, Exhibit C, at 1. And she otherwise did not archive, back up, or export the data before deleting her account. Anderson Decl., Exhibit B, ¶ 22; *see Fast*, 340 F.R.D. at 339–40 (explaining features on social media platforms that allow user to preserve data while removing them from public view); *Edwards v. Junior State of Am. Found.*, 2021 WL 1600282, at *8 (E.D. Tex. Apr. 23, 2021) (same).

**3. The data from Plaintiff's deleted Instagram account cannot be restored or replaced.**

*Finally*, there is no indication that the evidence can be restored or replaced through additional discovery. ESI is lost for purposes of Rule 37(e) when it "is irretrievable from another source, including other custodians" that may have a copy of the information stored on their own devices. *Blockchain Innovation, LLC v. Franklin Res., Inc.*, 2024 WL 4008759, at *1 (N.D. Cal. Aug. 30, 2024) (quoting *Steves & Sons, Inc. v. JELD-WEN, Inc.*, 327 F.R.D. 96, 107 (E.D. Va. 2018)). The key "question is whether the *electronically stored information* can be restored or replaced, not whether a litigant could obtain similar information by, for example, obtaining statements from witnesses." *Staggers*, 830 F. Supp. 3d at 76 (citation modified) (collecting cases). Similarly, just because a party can obtain *some* ESI from other sources, it "does not mean that all [information can be] recovered or that a complete record . . . is available." *Paisley Park Enters., Inc. v. Boxill*, 330 F.R.D. 226, 235 (D. Minn. 2019) (discussing text messages and emails recovered

[8] When confronted at her deposition with how close in time she deleted her Instagram account and filed her first lawsuit against Hilton, Plaintiff changed her story, claiming instead that she deleted the account in 2023. Pl. Dep. 269:25–270:2, Exhibit F.

from other custodians). Therefore, in circumstances where a party can obtain only "scattershot" information, rather than a "complete record," courts do not hesitate to find that the missing information cannot be replaced or restored by the other sources. *Id.* (citation modified).

Plaintiff admits that she does not have any of the ESI from her deleted Instagram account in her possession. May 1 Email, Exhibit C, at 1. Nor can she obtain it from other sources. *See* Anderson Decl., Exhibit B, ¶¶ 20–21. When Hilton subpoenaed Meta for information related to Plaintiff's Instagram account, Meta explained that it could not retrieve the account and "Meta may not have records going back to 2016." Letter from counsel for Meta, Exhibit U. And while *some* of the Instagram posts appear to have been cross-listed on Facebook, not all of them were. *See* Apr. 28 Letter, Exhibit M, at 8–9; Anderson Decl., Exhibit B, ¶ 21. Moreover, the practical reality of how Instagram and Facebook operate as distinct platforms means that cross-posted content on Facebook will rarely constitute a complete substitute for lost information on Instagram. Anderson Decl., Exhibit B, ¶ 21. Specifically, Instagram and Facebook maintain separate internal self-collection tools that capture different categories of platform-specific data. *See* PRACTICAL LAW LITIGATION, SOCIAL MEDIA: INTERNAL SELF-COLLECTION TOOLS (2026), Westlaw W-022-6900. As relevant here, Instagram's platform-specific metadata—such as geolocation tags, hashtags, tagged accounts, and timestamps of original posts—may differ from or be absent in the Facebook version. Anderson Decl., Exhibit B, ¶ 23. Similarly, Instagram's and Facebook's data exports differ, including comments on the user's or others' posted photos and videos, searches performed on each platform, login history, direct messages, and the following/follower lists. Anderson Decl., Exhibit B, ¶ 24. Information unique to each platform, therefore, cannot be replicated. *See* SOCIAL MEDIA: INTERNAL SELF-COLLECTION TOOLS, Westlaw W-022-6900.

**B. Plaintiff purposefully destroyed evidence to evade her litigation obligations.**

In deciding whether to impose sanctions, the next question the Court must ask is whether Plaintiff "acted with the intent to deprive [Hilton] of the information's use in the litigation." FED. R. CIV. P. 37(e)(2). Rule 37(e) does not define intent, "but in context, the word is most naturally understood as involving the willful destruction of evidence with the purpose of avoiding its discovery by an adverse party." *Jones v. Riot Hosp. Grp. LLC*, 95 F.4th 730, 735 (9th Cir. 2024).

"Because intent can rarely be shown directly, a district court may consider circumstantial evidence in determining whether a party acted with the intent required for Rule 37(e)(2) sanctions." *Id.* "Relevant considerations include the timing of destruction, affirmative steps taken to delete evidence, and selective preservation." *Id.* All three considerations point in the same direction: Plaintiff intentionally deleted her original Instagram account so that it could not be used as evidence in this litigation, and then, when confronted with the deletion, changed her story and made false statements about it.

To see why, a few examples from other cases are instructive. In *Fast*, the court found that the plaintiff "deleted . . . Facebook posts with an intent to deprive Defendants of their use in th[e] litigation" based on evidence that the plaintiff told others that her employer, the defendant, could be reading her messages; she chose to "permanently delete the posts rather than archiving them"; and offered "implausibl[e]" explanations "for why she deleted the posts (that they contained incorrect information or could adversely influence prospective employers)." 340 F.R.D. at 339–40. Likewise, in *Torgersen v. Siemens Bldg. Techs.,* the court found the plaintiff's "destruction of his Facebook was intentional" and his "explanation for what happened . . . [was] balderdash." 2021 WL 2072151, at *4 (N.D. Ill. May 24, 2021). There, the plaintiff claimed that he deleted his account due to "ever increasing online threats and intimidating communications" but "provided no details of these alleged threats and . . . no way to verify the veracity of this statement." *Id.* "Further casting doubt on the veracity of Plaintiff's tale" were the "shifting explanations about whether and when Plaintiff's counsel notified Plaintiff his social media accounts were being sought," "the tangential timing of Plaintiff's deletion of his Facebook page so soon after [a] request for the same," and "Plaintiff's evasion in answering the discovery after his page had been deleted." *Id.* In light of those facts, the court had no trouble concluding that the conduct was "an intentional act designed to deprive Defendants of relevant ESI." *Id.* at *5.

The same treatment is warranted here. Like the plaintiffs in *Fast* and *Torgersen*, Plaintiff took affirmative steps to selectively delete her Instagram account more than five years after retaining her first law firm and weeks before filing her first TVPRA-related lawsuit against Hilton. *See* May 1 Email, Exhibit C, at 1 (noting April 2024 deletion); *K.R.D. I*, No. 5:24-cv-03499.

Plaintiff admitted that she chose to delete the account permanently (purportedly so that her new husband would not see its content) rather than deactivate it (which would have preserved ESI), while keeping her other social media profiles active. *Supra* at 10–11. And she otherwise refused to give straight answers to discovery inquiries about that account. She did not disclose the account at all in her initial interrogatory responses—instead swearing that a different account (created in October 2024) had been active since 2013. *See* Pl.'s Resp. to Hilton's Interrog. No. 7, Exhibit A, at 6. She revealed the original account only after Hilton confronted her counsel with evidence of its existence. Anderson Decl., Exhibit B, ¶¶ 13–14; May 1 Email, Exhibit C, at 1. Moreover, when confronted with the deletion date and how close it fell to the filing of her original complaint against Hilton, Plaintiff claimed for the first time that she had actually deleted the account in 2023. Pl. Dep. 267:20–268:4, Exhibit F.

Plaintiff's continued "lies and acts of deception" during the discovery process leave no doubt her conduct was willful. *Burris v. JPMorgan Chase & Co.*, 566 F. Supp. 3d 995, 1017 (D. Ariz. 2021). Specifically, Plaintiff has given conflicting accounts on numerous topics related to her original Instagram account, including:

- When her Instagram use began: 2013 (according to her initial interrogatory responses) and 2016 (according to her fifth amended responses and her deposition). Pl.'s Resp. to Hilton's Interrog. No. 7, Exhibit A, at 6; Pl.'s Fifth Am. Supp. Resp. to Hilton's Interrog. No. 7, Exhibit O, at 10; Pl. Dep. 273:14–274:1, Exhibit F.
- When the deleted account was active: First, that the account was created in 2016. Pl.'s Sixth Supp. Resp. to Hilton's Interrog. No. 7, Exhibit V, at 10. Then, "2017 to 2022 is her best guess." Email from C. Brown, Provost Umphrey, to C. Baldwin, Jones Day, Exhibit S, at 1–2.
- When she deleted it: April 2024 (per her counsel), unknown (in her fifth amended responses), or "either March or April of 2023" (at her deposition). *See* May 1 Email, Exhibit C, at 1; Pl.'s Fifth Am. Supp. Resp. to Hilton's Interrog. No. 7, Exhibit O, at 10; Pl. Dep. 269:25–270:2, Exhibit F.
- What it was used for: She told Hilton the account was "just used to watch reels," a

feature that did not exist on Instagram until 2020, but then testified that she used it to post about her "day-to-day life," including birthday parties and friend outings. Pl.'s Fifth Am. Supp. Resp. to Hilton's Interrog. No. 7, Exhibit O, at 10; Pl. Dep. 323:24–324:11, Exhibit F. She also admitted to posting on Instagram at least one photo from the boudoir photoshoots. Pl. Dep. 274:15–19, Exhibit F; JD(KRD)-18472, Exhibit R.

She also has misrepresented or misled the Court in material ways. For example, Plaintiff told the Court her Instagram "was not active during her trafficking period and is not active today," a statement inconsistent with her sworn interrogatory response and with her counsel's statement four days earlier that the account was active. Joint Status Report 4, Dkt. No. 82. She also told the Court through her counsel that she had "responded [to Hilton] with respect to the Instagram information as ordered by the Court"—while never disclosing that she had destroyed the only Instagram account that existed during her alleged trafficking period. Joint Status Report 2, Dkt. No. 84. These representations and others further evaded questions on the creation and use of the relevant account and undisclosed handles.

These ever-changing stories, like the "shifting explanations" in *Torgersen*, and the suspicious timing, confirm that Plaintiff's deletion was no accident. 2021 WL 2072151, at *4.

**C. Dismissal is the most appropriate sanction.**

To dismiss a case under Rule 37(e)(2), "a district court need only find that the Rule 37(e) prerequisites are met, the spoliating party acted with the intent required under Rule 37(e)(2), and lesser sanctions are insufficient to address the loss of the ESI." *Jones*, 95 F.4th at 735. As explained above, the first two requirements for dismissal are met: Plaintiff willfully deleted her Instagram account in anticipation of this litigation to deprive Defendants of evidence that cannot be recovered. *Supra* at 7–10. Lesser sanctions cannot rectify the prejudice to Defendants.

The Ninth Circuit often considers three factors in deciding the availability of less drastic sanctions: "whether the court explicitly discussed alternative sanctions, whether it tried them, and whether it warned the recalcitrant party about the possibility of dismissal." *Valley Eng'rs Inc. v. Elec. Eng'g Co.*, 158 F.3d 1051, 1057 (9th Cir. 1998). Nevertheless, "despite all this elaboration of factors . . . it is not always necessary for the court to impose less serious sanctions first, or to

give any explicit warning." *Id.* Instead, what is "most critical for case-dispositive sanctions . . . is whether the discovery violations threaten to interfere with the rightful decision of the case." *Id.* (citation modified).

For example, in *Bruner v. City of Phoenix*, the court held that "Plaintiffs' behavior—specifically the deletion of relevant evidence, attempts to evade discovery, and failure to comply with two Court Orders—warranted [the] severe sanction[]" of dismissal. 2020 WL 554387, at *5 (D. Ariz. Feb. 4, 2020). Likewise, in *Milke v. City of Phoenix*, the court ordered terminating sanctions based on the plaintiffs' "failure to submit complete and accurate discovery responses," as well as the intentional destruction of "physical evidence . . . [and] electronically stored information" after a party's representative deactivated her online accounts and concealed a hard drive despite a court order. 497 F. Supp. 3d 442, 459, 464, 478 (D. Ariz. 2020), *aff'd*, 2022 WL 259937 (9th Cir. Jan. 27, 2022). And in *WeRide Corp. v. Kun Huang*, the court dismissed a case where the parties closed email accounts and altered content on laptops containing information central to the defendant's liability. 2020 WL 1967209, at *13–*16 (N.D. Cal. Apr. 24, 2020).

To sum up: "Dismissal is appropriate where a pattern of deception and discovery abuse ma[kes] it impossible for the district court to conduct a trial with any reasonable assurance that the truth would be available." *Valley Eng'rs Inc.*, 158 F.3d at 1057 (citation modified).

Plaintiff's conduct fits that description. For the reasons already explained by this Court, Plaintiff's social media—including from Instagram—is plainly relevant to Hilton's defenses and discoverable in this case. Anderson Decl., Exhibit B, ¶¶ 6–9, 24. Yet she deleted an entire social media account covering the years during and after her alleged trafficking, one month before her first lawsuit against Hilton and at a time when her retained counsel (of over five years) should have told her about her duty to preserve evidence. *Supra* at 3. She concealed the account's existence in sworn discovery responses. *Supra* at 7. She violated the Court's April 16 order by failing to advise Hilton by April 24 whether she still had any Instagram content, and she violated the Court's May 13 order by producing only Facebook content by the May 28 deadline, then producing her current Instagram content a month late. Apr. 16 Order, Dkt. No. 83; Further Order re Feb. 11, 2026 Disc. Dispute, Dkt. No. 85. *Supra* at 9. She disclosed additional accounts and usernames only after

Hilton discovered them on its own. And she has given inconsistent accounts, to Hilton, to Meta, and to this Court, of when the deleted account was created, how she used it, and when she deleted it. Because Plaintiff is the only source of information about the account's contents, and her representations have proven unreliable at every turn, no lesser sanction can give Hilton reasonable assurance that the truth about the lost evidence will come out at trial.

Plaintiff's social media use is relevant to her claims and contains contemporaneous evidence of her allegations and any defenses thereto. This Court permitted Plaintiff to move forward with her perpetrator and beneficiary TVPRA claims against both Defendants based on a theory that Plaintiff was trafficked at their property, the San Jose DoubleTree. *Doe (K.R.D.)*, 798 F. Supp. 3d at 1092, 1098. Hilton's liability turns on whether Plaintiff can successfully prove that Hilton (a) directly harbored her in violation of § 1591(a) (the perpetrator theory), or (b) "knowingly benefit[ted], financially or by receiving anything of value" "from participation in a venture" that they "knew or should have known has engaged in an act in violation of [§ 1591]," § 1595(a) (the beneficiary theory). *Id.* at 1092, 1098, 1100. To succeed on a perpetrator claim, Plaintiff must show that Defendants "knowingly harbored her with knowledge or reckless disregard of the fact that she would be forced to engage in commercial sex acts." *Id.* at 1099.[9] To succeed on a beneficiary claim, Plaintiff must, as relevant here, prove there were "sufficient signs of trafficking . . . to make her trafficking obvious to defendants." *Id.* at 1097. To meet her burden, Plaintiff must prove that she was trafficked at the San Jose DoubleTree. She must also prove facts related to her trafficking, such as that Plaintiff "carr[ied] no belongings and w[ore] only provocative clothing while checking into or picking up keys to rooms that various men had reserved"; "an onslaught of men who were not hotel guests stream[ed] in and out of [Plaintiff's] room at odd hours"; Plaintiff "appeared fearful, anxious, or physically abused"; that "her room was filled with bulk sexual paraphernalia"; or that she "showed signs of malnourishment, poor hygiene, or fatigue." *Id.*

As explained above and as numerous courts—including this one—have recognized, Plaintiff's social media during her alleged trafficking period is "not only relevant, it is critical to

[9] At the appropriate time, Hilton intends to challenge some of the Court's rulings on the legal standard applicable to perpetrator and beneficiary claims based on recent circuit precedent interpreting the TVPRA.

[Hilton's] defense" of her TVPRA claims. *M.A.*, 2024 WL 3029215, at *3; *supra* at 15. For example, "social media data can show not only where a plaintiff was located during the time she alleges she was sex trafficked, but it can also provide insight into her activities, freedom of movement, relationships, and emotional state during the relevant period." Order at 4, *In re Hotel TVPRA Litigation*, No. 2:19-cv-755, Dkt. No. 21. Social media messages also provide "relevant information regarding what [the plaintiff] was going through and what other people should have known about her." Transcript of Telephonic Status Conf. Proc. at 15, *M.A. v. Wyndham Hotels & Resorts, Inc.*, No. 2:19-cv-00849 (S.D. Ohio Nov. 20, 2023), Dkt. No. 498. Public posts, direct messages, or interactive status updates can dispute claims that a plaintiff was trapped, heavily monitored, or visibly distressed on the property. Discrepancies between a plaintiff's deposition or complaint and her digital footprint can impeach her credibility before the factfinder. And recovered messages between the plaintiff and third parties (including the alleged trafficker) can reframe the nature of the relationship, perhaps suggesting voluntary association instead of a coerced relationship. Accordingly, Plaintiff's complete digital footprint during the time she alleges she was trafficked provides the best evidence of whether this trafficking even occurred and whether these signs were even observable.

The same is true for her post-trafficking damages period. Because Plaintiff did not seek medical treatment, Plaintiff's social media is the only "objective and contemporaneous example[]" of her day-to-day activities, emotional condition, and functional capacity and thus is directly related to the damages that she attributes to Hilton. *Lieberman v. Unum Grp.*, 2021 WL 8154889, at *9 (C.D. Cal. Oct. 14, 2021); *Hinostroza v. Denny's Inc.*, 2018 WL 3212014, at *6 (D. Nev. June 29, 2018) ("[S]ocial media is relevant to claims of emotional distress because social media activity, to an extent, is reflective of an individual's contemporaneous emotions and mental state.").

Without access to the complete social media picture, Defendants are prejudiced in preparing a defense, proving they cannot be held liable, and foreclosing (or limiting) any damages award. Dismissal is therefore warranted.

**D. At a minimum, an adverse inference instruction and an award of attorneys' fees are warranted.**

Dismissal is clearly warranted. But even if this Court is not inclined to dismiss the case at this time, it should at minimum impose an adverse inference instruction that Plaintiff's destroyed evidence would have supported that she cannot meet her burden of proof on either that she was trafficked at the San Jose DoubleTree or that Hilton should have known that Plaintiff was being trafficked—or any other such inference as the Court deems proper. This Court should also compensate counsel for their fees and costs in uncovering and addressing Plaintiff's spoliation of evidence.

Both Section (e)(1) and (e)(2) permit such sanctions. *See* FED. R. CIV. P. 37(e)(1) ("upon finding prejudice to another party from loss of the information, [the court] may order measures no greater than necessary to cure the prejudice"); (e)(2)(A)–(B) (permitting an instruction to "presume that the lost information was unfavorable to the party" and an "instruct[ion to] the jury that it may or must presume the information was unfavorable to the party"). Because Plaintiff intentionally destroyed irreplaceable evidence bearing on central liability questions in the case, an adverse inference instruction is, at a minimum, necessary to cure the prejudice to Hilton.

Attorneys' fees are also warranted regardless of whether this Court concludes Plaintiff acted with intent to destroy evidence. In addition to the sanctions available under Section (e)(2), "courts may award costs and fees associated with spoliation as a sanction under Rule 37(e)(1)" after a finding of prejudice. *RG Abrams Ins. v. L. Offs. of C.R. Abrams*, 342 F.R.D. 461, 522 (C.D. Cal. 2022). As the Advisory Committee explained, the "range of such measures is quite broad if they are necessary for this purpose" and "[m]uch is entrusted to the court's discretion." FED. R. CIV. P. 37(e)(1) advisory committee's notes to 2015 amendment. And courts routinely award attorneys' fees where, as here, a party has been prejudiced by the spoliation of electronically stored information. *See, e.g.*, *Am. Fed'n of Gov't Emps., AFL-CIO (AFGE) v. Trump*, 2026 WL 2679500, at *17 (N.D. Cal. Sept. 11, 2026) ("The Court finds that an award to plaintiffs to compensate for their fees and costs incurred in uncovering and addressing the spoliation is appropriate."); *RG Abrams Ins.*, 342 F.R.D. at 522 (finding monetary sanctions appropriate under Rule 37(e)(1) given

a finding of prejudice for loss of text messages); *Spencer v. Lunada Bay Boys*, 2018 WL 839862, at *1–2 (C.D. Cal. Feb. 12, 2018) (similar). The Court should order the same here.[10]

## V. CONCLUSION

"It is well settled that dismissal is warranted where . . . a party has engaged deliberately in deceptive practices that undermine the integrity of judicial proceedings." *Anheuser-Busch, Inc. v. Nat. Beverage Distribs.*, 69 F.3d 337, 348 (9th Cir. 1995). Just so here. Given Plaintiff's intentional destruction of her Instagram account and other evasive discovery behavior, Hilton respectfully requests that the Court dismiss this case with prejudice. At minimum, an adverse inference instruction and/or an award of attorneys' fees is warranted.

[10] Hilton can provide an accounting of its costs and fees for review at the Court's request.

Dated: October 27, 2026

Respectfully submitted,

JONES DAY

By: */s/ Nicole M. Perry*

Nicole M. Perry, Esq., *Pro Hac Vice*
JONES DAY
717 Texas Street, Suite 3300
Houston, TX 77002
Telephone: (832) 239-3939
Facsimile: (832) 239-3600
Email: nmperry@jonesday.com

Bethany K. Biesenthal, Esq., *Pro Hac Vice*
Allison L. McQueen, Esq., *Pro Hac Vice*
JONES DAY
110 North Wacker Drive, Suite 4800
Chicago, IL 60606
Telephone: (312) 782-3939
Facsimile: (312) 782-8585
Email: bbiesenthal@jonesday.com
amcqueen@jonesday.com

Andrew J. Clopton, Esq., *Pro Hac Vice*
JONES DAY
150 W. Jefferson, Suite 2100
Detroit, MI 48226
Telephone: (313) 733-3939
Facsimile: (313) 230-7997
Email: aclopton@jonesday.com

Emily F. Knox
JONES DAY
555 California Street, 26th Floor
San Francisco, CA 94104
Telephone: (415) 626-3939
Facsimile: (415) 875-5700
Email: egoldbergknox@jonesday.com

Attorneys for Defendant
*Hilton Domestic Operating Company Inc.*

**CERTIFICATE OF SERVICE**

I hereby certify that on October 27, 2026, a copy of the foregoing was filed using the CM/ECF system, which will effectuate service on all counsel of record.

*/s/ Nicole M. Perry*____________
Nicole M. Perry, Esq.

Attorney for Defendant
*Hilton Domestic Operating Company Inc.*